## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

MADE TO ENGAGE, LLC, )
a Kansas limited liability company, )
 )
  and )
 )
JILL STERN, )
an individual, )
 )  Civil Action No. 2:24-cv-02507
   Plaintiffs, )
 )
  v. )
 )
95 PERCENT GROUP LLC, )
a Delaware limited liability company, )
 )
   Defendant. )

## COMPLAINT

  Plaintiffs Made to Engage, LLC and Jill Stern, by and through their attorneys, hereby file this Complaint against Defendant 95 Percent Group LLC, and allege as follows:

### PARTIES

  1. Plaintiff Made to Engage, LLC is a Kansas company having a principal place of business at 5125 West 157th Street, Overland Park, Kansas 66224.

  2. Plaintiff Jill Stern is a Kansas resident residing in Overland Park, Kansas.

  3. Defendant 95 Percent Group LLC is a Delaware company with its principal place of business at 475 Half Day Road, Lincolnshire, Illinois 60069.

### JURISDICTION AND VENUE

  4. This civil action seeking declaratory relief and damages, arises under the copyright laws of the United States, 17 U.S.C. §§ 101, et seq.  This Court has subject matter

jurisdiction under 28 U.S.C. §§ 1331, 1332, and 2201, and the Declaratory Judgment Act, 28 U.S.C.§ 2291.  This action is for tortious interference with contract, tortious interference with prospective business advantage, defamation, and unfair competition under the laws of the State of Kansas.

5.    This Court also has jurisdiction under the Digital Millennium Copyright Act ("DMCA") 17 U.S.C. § 512(g)(3)(D), which provides jurisdiction to the Federal District Court for the judicial district in which the address of the counter-notification subscriber (Plaintiffs) is located."

6.    This Court has supplemental jurisdiction of the state statutory and common law claims under 28 U.S.C. §§ 1338(b) and 1367(a).  This complaint asserts claims for federal misrepresentation under 17 U.S.C. § 512(f); for violation of Kansas statutes § 50-626 et seq. and the common law of Kansas.

7.    This Court has personal jurisdiction and venue is proper in this Court pursuant to 28 U.S.C. § 1391 since Defendant is, upon information and belief, doing business in, and substantially all conduct occurred within this District.

## SUMMARY OF THE COMPLAINT

8.    This is a civil action seeking declaratory relief and damages following Defendant's misrepresentation to Teachers Pay Teachers ("TPT") that has resulted in the improper "takedown" of Plaintiffs' entire product line from the TPT online marketplace for Pre-K - 12 resources, thus causing irreparable harm to Plaintiffs' business and reputation.

9.    TPT is the world's largest marketplace of Pre-K - 12 resources, powered by a global community of experienced educators.  On TPT educators can find endless innovative and inspiring ideas to address every learning moment.  For first-year teachers and 20-year veterans

alike, TPT has everything educators need to bring more creativity to their instruction, better engage students, and level up their teaching skills.

10.    On October 9, 2024, Plaintiffs Made to Engage and Jill Stern received DMCA a takedown notice from TPT based on a false allegation of copyright infringement and trademark infringement made by Defendant 95 Percent Group.  **Exhibit 1**.

11.    On October 16, 2024, counsel for Plaintiffs contacted counsel for Defendant 95 Percent Group to discuss the false takedown notice Defendant had filed with TPT.  During that discussion, counsel for Plaintiffs provided counsel for Defendant with indisputable evidence that there was no reasonable claim of copyright infringement or trademark infringement, and requested that Defendant withdraw its takedown notice.

12.    Defendant refused to withdraw its takedown notice.

13.    Plaintiffs contacted TPT October 25, October 28, and October 29, 2024, filing counter notifications and demanding that the takedown be withdrawn.  TPT has ignored Plaintiffs' counter notifications.

14.    On October 28, 2024, counsel for Plaintiffs sent another demand to Defendant to withdraw the false takedown notice.  **Exhibit 2.**  Defendant ignored the demand without comment.

15.    Defendant's actions have harmed and will irreparably harm Plaintiffs' business and reputation unless Defendant is preliminary and permanently enjoined from further delay in withdrawing the takedown notice.

16.    Plaintiffs seek a temporary restraining order, including costs, preliminary and permanent injunctions, damages, profits, statutory damages, attorneys' fees and costs and other relief as more fully set forth below.

## STATEMENT OF FACTS

17.    Plaintiff Jill Stern is the owner of Plaintiff Made to Engage, LLC.

18.    Jill is a Kansas teacher with over 25 years of classroom experience teaching in the Blue Valley School District.

19.    In December of 1996, Jill earned a Bachelor of Science in Elementary Education, including K-9 Elementary Education, 5-9 Mathematics Certification, and 5-8 Science Certification from Kansas State University.

20.    Jill earned a Master of Educational Technology from MidAmerica Nazarene University.

21.    Jill has taught first and second grades for the last 20 years.

22.    Jill taught seventh grade for seven years prior to her current teaching assignment.

23.    Over the years, Jill has planned, created, and taught meaningful instruction aligning with Blue Valley School District and Kansas State standards, including preparing lesson plans for phonics instruction.

24.    Jill has built positive relationships with students and parents, supporting classroom families in the educational process.

25.    Jill has collaborated with administrators and colleagues on classroom policies, management strategies, and instructional practices for the classroom.

26.    Jill has taught students virtually, implementing engaging lessons through Zoom while utilizing Canvas, Seesaw, Nearpod, and various other virtual learning platforms.

27.    Jill is a proven Educational Leader receiving recognition from her colleagues and the Blue Valley School District, including CHE BV Teacher of the Year Nominee

(2012, 2022); BV Innovative Teacher of the Year, Elementary Recipient (2012); Seesaw Certified Educator (2016 – Present); Digital Content Station Designer (2021-2022); Building Leadership Representative (2010-2018, 2021 – Present); and LETRS Trained and Certified (2023-2024).

28.    Upon moving to second grade, Jill spent 2020-2021 as a virtual teacher. Like most of the districts across the nation, Kansas teachers were hugely unprepared for virtual teaching and she spent hours after being online with students each day converting almost everything needed to teach into a digital format for students to utilize on the Canvas Learning Management System.

29.    When Jill returned to in-person teaching in the fall of 2022, she had a year's worth of custom-developed lesson plans and activities that she and her team of fellow second grade teachers utilized in their classrooms, including lesson plans pertaining to phonics.

30.    That year the Blue Valley School District started utilizing 95 Percent Group Phonics materials in its classrooms.  Teachers in the Blue Valley School District had previously been made aware of an anticipated shift from teaching phonics skills during reading lessons, to a more foundational approach.

31.    Along with other teachers in the Blue Valley School District, Jill attended professional development sessions on dyslexia and structured literacy teaching methods.  In addition, Jill took classes during the summer to learn more about implementing structured literacy teaching methods in her second grade classroom.  Before she ever used Defendant's phonics curriculum, Jill had extensive knowledge of structured literacy.

32.    Jill used Defendant's phonics curriculum to teach her students phonics daily.  But the team Jill worked with determined that Defendant's phonics curriculum lacked the materials required to support students in need of intervention, such as those students who grasped

the material quickly and needed more challenging work and those students who struggled and needed more support. The worksheets, games, activities, and other old materials that Jill and her team had used for years to supplement students in need of intervention were no longer effective because they did not align with the scope or sequence of Defendant's newly-adopted phonics materials. For example, whereas Jill and her team's old materials were designed to simultaneously teach their students several spelling patterns for the "long o" phonetic unit, Defendant's phonics curriculum was designed to teach some of the spelling patterns in one week and some of the spelling patterns in other weeks. Students became confused when using the old materials because the old materials incorporated concepts that had not yet been covered under Defendant's phonics curriculum.

33. Jill searched for supplemental materials to overcome the shortcomings of Defendant's phonics curriculum, but she had to be mindful of the curriculum standards she was expected to meet in numerous subjects, including phonics and reading. The introduction of Defendant's phonics curriculum made it challenging for Jill to meet her curriculum standards in both phonics and reading, as very little material in Defendant's phonics curriculum aligned with the reading curriculum standards. Finding the existing supplemental materials inadequate to address the challenges that she and her team faced, Jill began developing specially tailored supplemental phonics materials on her computer, including word searches, graphic organizers, and fluency strips. Jill had extensive experience in developing similar supplemental materials for writing, reading, mathematics, and other subjects while teaching both virtually and in the classroom.

34. Jill and her team began using the materials she created for phonics instruction to supplement Defendant's phonics curriculum and found that the extra independent or

supported practice with phonetics helped some students, particularly those needing intervention, to grasp the concepts and thrive. Jill's teammates joked that she could have success selling her materials to other teachers on TPT. Jill laughed off their suggestions for a time, but after considering the benefits her students reaped from resources she and her teammates had purchased from TPT in the past and realizing that other students and teachers could similarly benefit from her materials, Jill was inspired to open her own TPT store.

35.     Jill's principal recognized her efforts to develop supplemental activities and materials for her students and asked her to represent second grade teachers on a year-long Blue Valley School District committee created to assemble online "Digital Content Stations" for reading, writing, science, and social studies on the Canvas virtual learning platform. While on that committee, Jill collaborated with other educators to create content that every second grade teacher in the Blue Valley School District could use to assign differentiated activities to students as the students worked independently or in small groups.

36.      Jill spent the summer of 2022 brainstorming, researching, and working towards launching a TPT store to sell her phonics education materials. She scoured the "Help" section of TPT to learn everything she could about using fonts and graphics with her resources and she joined a Facebook group for TPT sellers where she learned about best practices for success.

37.     By August of 2022, Jill was ready to open a store of her own. She posted a few resources at a time and watched cautiously, continuing to think of new ideas and create new materials to benefit her fellow teachers and their students.

38.     That fall, Jill's co-workers chose her as their elementary school's nominee for the Blue Valley School District's "Teacher of the Year" award—her second nomination in ten years. Also that fall, Jill began coursework to obtain her LETRS certification. During the two-

year certification process, she spent over 100 hours learning the ins and outs of reading, spelling, and phonetics, giving her a deeper understanding of structure literacy, the science of reading, and phonetics that she integrated into her lessons and the resources offered on her TPT store.

39.     While pursuing her LETRS certification, Jill continued to develop resources for her TPT store.  She focused on developing standard-alone resources that did not need to be used with a specific curriculum and were easy and simple for teacher and students to use.  Using her knowledge of phonetics and the science of reading, Jill developed and offered for sale word-based skill exercises, fiction fluency stories, fluency strips, word sorts, and sentence writing exercises.  She also developed games that students could play to practice high-frequency/heart words.

40.     Many of the resources Jill developed and sold on her TPT store facilitate compliance with Kansas' Every Child Can Read Act and similar laws in other states, which serve to ensure that students achieve proficiency in reading.  Jill's resources utilize the science of reading and offer tiered interventions in phonics, vocabulary, and reading fluency, and comprehension to help teachers in Kansas comply with the Every Child Can Read Act by helping their students learn to read and bridge any gaps they may have to reach benchmark goals.

41.     In addition to her efforts as an educator and entrepreneur, Jill is a full-time mom and wife to an educator-turned-principal.  Her youngest children–twins–were in high school when she started her TPT store, and the potential of earning extra income to help pay for their college educations continually motivated her to develop and sell resources on her TPT store.  Jill and her husband both hold advanced degrees and understand the value of education.  Jill and her husband have devoted themselves to careers of service in public education, and in doing so have

sacrificed financial earnings, savings, and security, and as such had hoped to leverage Jill's expertise as an educator to fulfill their dream of helping pay for their children's college.

42.     Jill has regularly held leadership roles at her elementary school and with the Blue Valley School District, including taking on a two-year role as a mentor to a new teacher and being asked to join an English Language Arts cadre to direct the adoption of new curriculum. To better serve and communicate with the diverse group of students at her elementary school, Jill spent several weeks studying and passing a certification exam to obtain a PreK-12 ESOL endorsement.

43.     Jill has continually invested in and grown her TPT store. She tapped into her years of experience as a first grade teacher to develop resources tailored to first grade curriculum. Jill's store saw success, and she saved and re-invested the revenue her store earned to develop more resources and further grow her business. In September of 2024, Jill registered her store as the small business Made to Engage, LLC.

44.     Now in her 28th year of teaching, Jill has worked tirelessly to help hundreds of students learn and grow. Almost 24 years ago, Jill thought that she would have to leave the teaching profession altogether after being diagnosed with an autoimmune disease during her first pregnancy. Several years later, she became pregnant with twins, and was diagnosed with a second autoimmune disease which affected her hearing at a rapid pace. Being a young mom, with young children, battling a progressive hearing loss, all while teaching and performing selfless acts each day to better the lives of her students changed Jill's perspective on life. Despite the years of medication, trips to the doctor's office, and working through the expense of purchasing and using hearing aids, she was still losing her hearing but continued to teach in her classroom each day. After years of continual hearing decline, Jill had surgery for bilateral cochlear implants. Her

audiologist marveled at the gains she was making, and believed Jill's efforts in teaching young students to read through phonics was the reason for this progress. Phonics instruction has not only allowed her students to become good readers, it has also played a monumental role in helping Jill rebound from the years she lost during her health struggles and allowed her to engage with the things and people she loves.

45.     The unlawful takedown notice filed by Defendant with TPT has robbed Jill of her dreams and irreparably harmed Made to Engage.

46.     Plaintiff did not copy any of Defendant's products or materials.

47.     Plaintiff used the name "95% Phonics" in the description of its products to indicate that its products are compatible for use with Defendant's products.

48.     Plaintiff used the name "95% Phonics" descriptively, not as a mark, and in good faith.

49.     Defendant does not have a registered trademark for "95% PHONICS".

50.     Defendant's takedown notice resulted in 149 phonics lessons being removed from Made to Engage's TPT store.

51.     Before sending the takedown notice to TPT, Defendant did not order a single Made to Engage phonics lesson from TPT to investigate its allegations made in its takedown notice.

52.     Before sending the takedown notice to TPT, Defendant made no effort to determine if any purported similarity between Defendant's materials and Made to Engage materials constituted fair use under 17 U.S.C. § 107.

53.     Before sending the takedown notice to TPT, Defendant did not contact Made to Engage or Jill Stern to discuss or investigate its allegations.

54.     After receiving evidence from Made to Engage and Jill Stern that Defendant's allegations were false, Defendant has refused to withdraw its takedown notice with TPT.

55.     After receiving evidence from Made to Engage and Jill Stern that Defendant's allegations were false, Defendant did not order a single Made to Engage phonics lesson from TPT to investigate its allegations made in its takedown notice.

56.     After receiving evidence from Made to Engage and Stern that Defendant's allegations were false, Defendant made no effort to determine if any purported similarity between Defendant's materials and Made to Engage materials constituted fair use under 17 U.S.C. § 107.

57.     After receiving counter notifications for its false copyright infringement claims and trademark infringement claims filed with TPT by Made to Engage, Defendant has refused to withdraw its takedown notice with TPT, and has not made any effort to contact Plaintiffs.

58.     Made to Engage and Jill Stern have received negative feedback and comments from their customers because of 95 Percent Group's false accusations.

### COUNT I:  DECLARATORY JUDGMENT
**(Misuse of Copyright – False Takedown Notification Under 17 U.S.C. § 512)**

59.     Plaintiffs reallege and incorporate herein by reference the allegations of the paragraphs of the Complaint as set forth above.

60.     On or before October 9, 2024, Defendant signed a declaration and submitted to TPT a declaration that Made to Engage Content violated the copyrights of Defendant.  That claim was false, as the entirety of the Made to Engage Content was created by Jill Stern, and Defendant has no rights, under U.S. Copyright Law or otherwise, in the Made to Engage TPT content.

61.    Defendant knowingly and materially misrepresented to TPT under the DMCA takedown policy that the Made to Engage Content violated its copyrights.

62.    As a result of Defendant's intentional misrepresentations, TPT disabled Made to Engage's entire TPT account.

63.    Plaintiffs contacted Defendant and requested that it identify the copyright content claimed to have been infringed and notified Defendant that its assertions were incorrect, and that none of Made to Engage's content violated Defendant's copyrights.  Defendant did not respond to Plaintiffs.

64.    Plaintiffs filed a counter notification with TPT that its material was unlawfully removed from TPT.  Defendant has not responded to the counter notification filed by Plaintiffs.

65.    Defendant's intentional acts and conduct as alleged above have damaged and will continue to damage Made to Engage, including in the form of pecuniary loss and destruction of Plaintiffs' business, unless Defendant's acts are declared unlawful and it is ordered to withdraw its takedown notice with TPT.  Made to Engage is losing an estimated $2,000 every month its TPT store is down, separate and apart from the immeasurable irreparable harm faced by Plaintiffs in the form of crippling loss of customer goodwill.

66.    WHEREFORE, Plaintiffs pray for a declaration that Defendant's actions were unlawful, that Defendant be ordered to withdraw its takedown notices filed with TPT, and judgment against Defendant as set forth more fully below.

## COUNT II:  DECLARATORY JUDGMENT
### (Misuse of Trademark – False Takedown Notification Under 17 U.S.C. § 512)

67.    Plaintiffs reallege and incorporate herein by reference the allegations of the paragraphs of the Complaint as set forth above.

68.     On or before October 9, 2024, Defendant signed a declaration and submitted to TPT that Made to Engage Content violated the trademarks of Defendant.  That claim was false, as the entirety of the Made to Engage Content was created by Jill Stern, and Made to Engage did not use any of Defendant's registered trademarks in its materials.

69.     Made to Engage made reference to Defendant as the source of Defendant's materials properly under the trademark laws.

70.     Defendant knowingly and materially misrepresented to TPT under the DMCA takedown policy that the Made to Engage Content violated its trademarks.  There is no provision under the DMCA to takedown content based on an alleged trademark violation.

71.     As a result of Defendant's intentional misrepresentations, TPT disabled Made to Engage's entire TPT account.

72.     Plaintiffs contacted Defendant and requested that it identify the content claimed to have been infringed and notified Defendant that its assertions were incorrect, and that none of Made to Engage's content violated Defendant's trademarks.  Defendant has refused to engage or communicate with Plaintiffs.

73.     Plaintiffs filed a counter notification with TPT that its material was unlawfully removed from TPT.  Defendant has not responded to the counter notification filed by Plaintiffs.

74.     Defendant's intentional acts and conduct as alleged above have damaged and will continue to damage Made to Engage, including in the form of pecuniary loss and destruction of Plaintiffs' business, unless Defendant's acts are declared unlawful and it is ordered to withdraw its takedown notice with TPT.  Made to Engage is losing an estimated $2,000 every

month its TPT store is down, separate and apart from the immeasurable irreparable harm faced by Plaintiffs in the form of crippling loss of customer goodwill.

75.    WHEREFORE, Plaintiffs pray for a declaration that Defendant's actions were unlawful, that Defendant be ordered to withdraw its takedown notices filed with TPT, and judgment against Defendant as set forth more fully below.

<u>COUNT III:  MISREPRESENTATION</u>
**(False Takedown Notification Under 17 U.S.C. § 512)**

76.    Plaintiffs reallege and incorporate herein by reference the allegations of the paragraphs of the Complaint as set forth above.

77.    Plaintiff is informed and believes and based upon such information and belief alleges that Defendant had actual or constructive knowledge that Made to Engage's products did not infringe any "exclusive rights" protected by the Copyright Act, 17 U.S.C. § 106 because Defendant has yet to articulate with specificity what text, graphic, script, etc. is included in its alleged copyright.

78.    In Defendant's October 9, 2024 Takedown Notice and DMCA notification, purportedly issued under the authority of 17 U.S.C. § 512, Defendant knowingly and materially misrepresented that Plaintiffs' products infringed Defendant's un-articulated, yet alleged copyright.

79.    Further, there is no provision under the DMCA to take down a purported trademark violation.

80.    In Defendant's October 9, 2024 Takedown Notice and DMCA notification, purportedly issued under the authority of 17 U.S.C. § 512, Defendant knowingly and materially misrepresented that Plaintiffs were liable under copyright law for selling any of its products, all of which Defendant claimed were infringing.

-14-

81.    In Defendant's October 9, 2024 Takedown Notice and DMCA notification, purportedly issued under the authority of 17 U.S.C. § 512, Defendant knowingly intended to permanently injure Plaintiffs' business and reputation.

82.    Plaintiffs have been irreparably injured and will be further injured by Defendant's knowingly material misrepresentation and malicious and willful actions that Plaintiffs' products infringed Defendant's alleged copyright, resulting in the DMCA takedown by TPT.

83.    Defendant's actions have proximately caused damage to Plaintiffs, including but not limited to lost profits, and goodwill, monetary damage and damage to reputation.

84.    Defendant's unlawful actions are in violation of 17 U.S.C. § 512(f).

85.    WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth more fully below.

## COUNT IV:  TORTIOUS INTERFERENCE WITH CONTRACT

86.    Plaintiffs reallege and incorporate herein by reference the allegations of the paragraphs of the Complaint as set forth above.

87.    Plaintiffs entered into a contract with TPT to sell Plaintiffs' materials through TPT's online store.

88.    Because Defendant also has a contract with TPT to sell Defendant's materials through TPT's online store, it is aware of the agreement between Plaintiff and TPT.

89.    In Defendant's October 9, 2024 Takedown Notice and DMCA notification, Defendant intentionally caused TPT to breach its contract with Plaintiff by unlawfully taking down Plaintiff's online store.

90.     Defendant had no right to submit its Takedown Notice and DMCA notification to TPT, or to allege copyright or trademark infringement against Plaintiffs.

91.     Defendant's intentional acts and conduct as alleged above have damaged and will continue to damage Plaintiffs, separate and apart from the immeasurable irreparable harm faced by Plaintiffs in the form of crippling loss of customer goodwill.

92.     WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth more fully below.

## COUNT V:  TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE

93.     Plaintiffs reallege and incorporate herein by reference the allegations of the paragraphs of the Complaint as set forth above.

94.     Plaintiffs enjoyed a business relationship with its customers and TPT with the expectancy and probability of future economic benefit to Plaintiffs.

95.     Defendant had direct knowledge of Plaintiffs' relationship with its customers and TPT.

96.     Plaintiffs had a reasonable certainty that, except for the conduct of Defendant, Plaintiffs would have continued the relationship it had with its customers and TPT and realized the expectancy.

97.     In Defendant's October 9, 2024 Takedown Notice and DMCA notification, Defendant intentionally caused TPT to takedown Plaintiffs' store without justification or cause.

98.     Defendant's intentional acts and conduct as alleged above have damaged and will continue to damage Plaintiffs, separate and apart from the immeasurable irreparable harm faced by Plaintiffs in the form of crippling loss of customer goodwill.

99.    WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth more fully below.

## COUNT VI:  DECEPTIVE ACTS AND PRACTICES

100.    Plaintiffs reallege and incorporate herein by reference the allegations of the paragraphs of the Complaint as set forth above.

101.    Defendant has engaged in a deceptive act and practice in connection with the sale of its goods and the unlawful, unfair and fraudulent business practice of claiming an alleged copyright in and to all of Made to Engage products in violation of K.S.A. § 50-626.

102.    Defendant's takedown letter to TPT willfully included a written representation of exaggeration, falsehood, innuendo or ambiguity as to a material fact of its purported rights and Made to Engage goods in violation of K.S.A. § 50-626(b)(2).

103.    Defendant's takedown letter to TPT disparaged the property, services or business of Made to Engage by making, knowingly or with reason to know, false or misleading representations of material facts in violation of K.S.A. § 50-626(b)(4).

104.    As a result of Defendant's intentional acts and conduct Plaintiff Jill Stern seeks civil penalties against Defendant for each act in violation of K.S.A. § 50-626.

105.    WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth more fully below.

## COUNT VII:  COPYRIGHT MISUSE

106.    Plaintiffs reallege and incorporate herein by reference the allegations of the paragraphs of the Complaint as set forth above.

107.    Plaintiffs did not copy any of Defendant's products or materials.

108.    Any similarity between Plaintiffs' works and Defendant's works is fair use.

109.    Defendant does not have a copyright registration for any of the materials identified in its takedown notice to TPT.

110.    Defendant does not have a copyright registration for any of the materials identified in its takedown notice to TPT.

111.    Plaintiffs are informed and believe and based upon such information and belief allege that Defendant's motivation in demanding Plaintiffs' product removal was not to protect its alleged copyrights, but rather to prevent Plaintiffs from competing with Defendant.

112.    Plaintiffs are informed and believe and based upon such information and belief allege that Defendant used copyright claims in its cease-and-desist letter because the "safe harbor" provisions of the Digital Millennium Copyright Act, 17 U.S.C. § 512, provided a mechanism by which it could demand expeditious takedown of materials alleged to infringe copyright.

113.    Defendant engaged in the misuse of its alleged copyrights, including in the October 9, 2024 takedown notice, by claiming that Plaintiffs' products infringed Defendant's alleged copyrights when Defendant knew, or should have known, that the products did not.

114.    Before making its claims of copyright infringement, Defendant did not purchase a single of Plaintiffs' products to substantiate its claims of copyright infringement.

115.    Before making its claims of copyright infringement, Defendant did not compare a single of Plaintiffs' products it was having taken down to any of its own products.

116.    After receiving a full copy of one of Plaintiffs' lessons, proving that Plaintiffs did not copy Defendant's work, Defendant refused to withdraw the takedown notice with TPT.

117.    Defendant's intentional acts and conduct as alleged above have damaged and will continue to damage Plaintiffs, including in the form of pecuniary loss and general decline in business in an amount unknown at the present time.  Made to Engage is losing an estimated $2,000 every month its TPT store is down, separate and apart from the immeasurable irreparable harm faced by Plaintiffs in the form of crippling loss of customer goodwill by unlawfully taking down Plaintiffs' online store.

### COUNT VIII:  UNFAIR COMPETITION

118.    Plaintiffs reallege and incorporate herein by reference the allegations of the paragraphs of the Complaint as set forth above.

119.    Plaintiffs did not copy any of Defendant's products or materials.

120.    Plaintiffs used the name 95% Phonics in the description of its products to indicate that its products are compatible for use with Defendant's products.

121.    Plaintiffs used the name 95% Phonics descriptively, not as a mark, and in good faith.

122.    Defendant's unlawful, unfair and/or fraudulent business practice of claiming an alleged trademark infringement of all of Plaintiffs' products in the takedown letter to TPT was for the purpose of preventing Plaintiffs from competing in violation of Kansas law.

123.    As a proximate result of the acts of Defendants as alleged herein, Plaintiffs have suffered and will continue to suffer great damage, including lost profits and by tarnishing of its business, goodwill and reputation by not being able to sell its products.

124.    Plaintiffs have no adequate remedy at law for the acts of unfair competition as alleged herein.

125.    Unless this Court grants a stay of Defendant's DMCA takedown notice, Plaintiffs will not be allowed to continue selling its products and will suffer irreparable harm.

126.    The Defendant's intentional, willful and malicious acts as alleged herein, constitutes an act of unfair competition in violation of the laws of the State of Kansas.

127.    WHEREFORE, Plaintiff prays for judgment against Defendant as set forth more fully below.

## COUNT IX:  DEFAMATION

128.    Plaintiffs reallege and incorporate herein by reference the allegations of the paragraphs of the Complaint as set forth above.

129.    Defendant has made false and defamatory words, communicated to a third person, which have resulted in harm to the reputation of Plaintiffs.

130.    Plaintiffs have received negative feedback and communications from their customers because of Defendant's false takedown notices, and statements from Defendant.

131.    As a result of Defendant's false and defamatory words, Plaintiffs have been damaged by the loss of all business with TPT and their customers, harm to Plaintiffs' reputation, and have experienced decreased professional opportunities.

132.    WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth more fully below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Made to Engage respectfully prays that this Court enter judgment in its favor against Defendant, and award the following relief:

A.    Issuance of a preliminary and permanent injunction ordering Defendant to withdraw its takedown notices filed with TPT;

B.    Award Plaintiffs all damages sustained as a result of Defendant's tortious interference with contract;

C.    Award Plaintiffs all damages sustained as a result of Defendant's tortious interference with prospective business advantage;

D.    A declaration that Defendant has violated the Kansas Consumer Protection Act and award Plaintiff Jill Stern $10,000 for each of the 149 lessons taken down at the request of Defendant;

E.    A declaration that Defendant has violated the Kansas Consumer Protection Act and award Plaintiff Jill Stern an additional $10,000 for each of the 149 lessons taken down at the request of Defendant pursuant to K.S.A. § 50-677;

F.    Award Plaintiffs damages for Defendant's false and defamatory statements in the form of general damages for harm to Plaintiffs' reputation, damages for special harm to Plaintiffs' business, and punitive damages to punish Defendant's outrageous conduct;

G.    Award Plaintiffs punitive damages because of Defendant's outrageous and egregious conduct;

H.    Award Plaintiffs their costs and attorney's fees;

I.    Award Plaintiffs pre- and post-judgment interest as permitted by law; and

J.    Grant such further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of all issues so triable.


## DESIGNATION OF PLACE OF TRIAL

Plaintiff designates Kansas City, Kansas as the place of trial.


Respectfully submitted,

By: */s/ James J. Kernell*
    James J. Kernell, #19559
    AVEK IP, LLC
    7285 West 132nd Street, Suite 340
    Overland Park, Kansas 66213
    Telephone:  (913) 549-4700
    Facsimile:  (913) 549-4646
    Email:  jkernell@avekip.com

*Attorneys for Plaintiffs*
*Made to Engage LLC and Jill Stern*